Slip Op. 11-106

UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| AD HOC SHRIMP TRADE ACTION COMMITTEE,<br><br>        Plaintiff,<br><br>        - v -<br>UNITED STATES,<br><br>        Defendant,<br><br>        - and -<br><br>HILLTOP INTERNATIONAL and OCEAN DUKE CORP.,<br><br>        Defendant-Intervenors. | Before: Pogue, Chief Judge<br><br>Court No. 10-00275 |

OPINION AND ORDER

[Remanding Department of Commerce's final results of administrative review of antidumping duty order]

Dated: August 24, 2011

Picard Kentz & Rowe LLP (Andrew W. Kentz, Jordan C. Kahn, Nathaniel M. Rickard and Kevin M. O'Connor) for the Plaintiff.

Tony West, Assistant Attorney General; Jeanne E. Davidson, Director; Patricia M. McCarthy, Assistant Director, Commercial Litigation Branch, Civil Division, United States Department of Justice (Joshua Kurland) for the Defendant.

Grunfeld, Desiderio, Lebowitz, Silverman & Klestadt LLP (Mark E. Pardo, Andrew T. Schutz and Jeffrey O. Frank) for the Defendant-Intervenors.

**Pogue, Chief Judge**: This action seeks review of two determinations by the United States Department of Commerce

Court No. 10-00275                                                      Page 2

("Commerce" or the "Department") in the final results of the fourth administrative review of the antidumping duty order covering certain frozen warmwater shrimp from the People's Republic of China ("China").[1]

Specifically, Plaintiff Ad Hoc Shrimp Trade Action Committee ("AHSTAC") – the Petitioner in the administrative proceeding below – challenges (I) Commerce's exclusive reliance on Customs and Border Protection Form 7501 data, for entries designated by the importer as "Type 03" (consumption entries subject to antidumping/countervailing duty[2]) ("Type 03 CBP data"), when determining, under Section 777A(c)(2)(B) of the Tariff Act of 1930, as amended, 19 U.S.C. § 1677f-1(c)(2)(B) (2006),[3] the volume of entries of subject merchandise for this review; and (II) the Department's use of certain price data for merchandise exported from North Korea when calculating, under 19 U.S.C.

---

[1] See Certain Frozen Warmwater Shrimp From the People's Republic of China, 75 Fed. Reg. 49,460 (Dep't Commerce Aug. 13, 2010) (final results and partial rescission of antidumping duty administrative review) ("Final Results"); Issues & Decision Mem., A-570-893, ARP 08-09 (Aug. 9, 2010), Admin. R. Pub. Doc. 180 (adopted in Final Results, 75 Fed. Reg. at 49,460) ("I & D Mem."). The period of review ("POR") was February 1, 2008, through January 31, 2009. Final Results, 75 Fed. Reg. at 49,460.

[2] See Dep't of Homeland Security, U.S. Customs and Border Protection, CBP Form 7501 Instructions (Mar. 17, 2011), available at www.cbp.gov (Forms) ("CBP Form 7501 Instr.") 1.

[3] All further citation to the Tariff Act of 1930, as amended, is to Title 19 of the U.S. Code, 2006 edition.

§ 1677b(c)(1), the normal value of subject merchandise.

The court has jurisdiction pursuant to 19 U.S.C. § 1516a and 28 U.S.C. § 1581(c).

As explained below, the court concludes that (I) because the Department improperly failed to take into account record evidence that fairly detracts from the weight of the evidence supporting its entry volume determinations, the Department's consequent determinations regarding which respondents account for the largest volumes of subject entries during this POR were not supported by a reasonable reading of the record, and are therefore remanded to the agency for reconsideration; and (II) because the Department's application of its reasonable methodology comports with a reasonable reading of the administrative record, Commerce's treatment of North Korean data in this case is affirmed.

## STANDARD OF REVIEW

When reviewing the Department's decisions in administrative reviews of antidumping duty orders, this Court "shall hold unlawful any determination, finding, or conclusion found . . . to be unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i).

Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a

Court No. 10-00275                                                    Page 4

conclusion." <u>Consol. Edison Co. v. NLRB</u>, 305 U.S. 197, 229 (1938); <u>Ad Hoc Shrimp Trade Action Committee v. United States</u>, 618 F.3d 1316, 1321 (Fed. Cir. 2010) (same).  Importantly, "[t]he substantiality of evidence must take into account whatever in the record fairly detracts from its weight." <u>Universal Camera Corp. v. NLRB</u>, 340 U.S. 474, 488 (1951); <u>Tudor v. Dep't of Treasury</u>, 639 F.3d 1362, 1366 (Fed. Cir. 2011) (same).  The substantial evidence standard of review essentially asks whether, given the evidence on the record as a whole, the agency's conclusion was reasonable. <u>Nippon Steel Corp. v. United States</u>, 458 F.3d 1345, 1351 (Fed. Cir. 2006).

An agency acts contrary to law when it acts arbitrarily or based on an impermissible construction of its statutory authority. <u>See</u> <u>Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.</u>, 467 U.S. 837, 842-43 (1984); <u>SKF USA Inc. v. United States</u>, 263 F.3d 1369, 1382 (Fed. Cir. 2001).

## DISCUSSION

I. <u>Commerce's Exclusive Reliance on Type 03 CBP data for Respondent Selection</u>

   A. *Background*

   In its <u>Notice of Initiation</u> for this administrative review,

the Department announced its intention to rely on CBP data[4] to select respondents for individual examination, in the event that resources did not permit examination of all respondents for whom review was requested.[5]

Responding to the Department's request for "comments regarding the CBP data and respondent selection," Notice of Initiation, 74 Fed. Reg. at 13,178, AHSTAC argued that the CBP data released for comment – consisting entirely of Type 03 CBP

---

[4] Specifically, the Department relies in such situations on CBP 7501 forms. See Selection of Respondents for Individual Review, A-570-893, ARP 08-09 (May 29, 2009), Admin. R. Con. Doc. 8 [Pub. Doc. 41] ("Resp't Selection Mem.") 6; Pakfood Pub. Co. v. United States, __ CIT __, 753 F. Supp. 2d 1334, 1344-45 (2011) ("Pakfood"). Block 2 on CBP Form 7501 asks importers to "[r]ecord the appropriate entry type code by selecting the two-digit code for the type of entry summary being filed." CBP Form 7501 Instr., supra note 2, at 1 ("The first digit of the code identifies the general category of the entry (i.e., consumption = 0, informal = 1, warehouse = 2). The second digit further defines the specific processing type within the entry category. The following codes shall be used: Consumption Entries[:] Free and Dutiable [=] 01 . . . Antidumping/ Countervailing Duty (AD/CVD) [=] 03 . . . .").

[5] Certain Frozen Warmwater Shrimp from the Social Respublic of Vietnam and the People's Republic of China, 74 Fed. Reg. 13,178, 13,178 (Dep't Commerce Mar. 26, 2009) (notice of initiation of administrative reviews and requests for revocation in part of the antidumping duty orders) ("Notice of Initiation"). See 19 U.S.C. § 1677f-1(c)(2)(B) ("If it is not practicable to make individual weighted average dumping margin determinations [] because of the large number of exporters or producers involved in the investigation or review, [Commerce] may determine the weighted average dumping margins for a reasonable number of exporters or producers by limiting its examination to . . . exporters and producers accounting for the largest volume of the subject merchandise from the exporting country that can be reasonably examined.").

Court No. 10-00275                                                    Page 6

data[6] – did not accurately reflect the actual volume of subject merchandise entered by each respondent during the POR.[7] Specifically, ASTAC claimed that the volume of entries subject to the antidumping duty order on frozen warmwater shrimp from China, as reported on CBP 7501 forms, was substantially inaccurate. In support of this challenge, AHSTAC attached to its submission, and thereby placed on the record, *inter alia*, two reports to Congress – from CBP and the U.S. Government Accountability Office, respectively – as well as Commerce's own verified findings from the immediately preceding administrative review of this antidumping duty order, detailing recent discoveries of such substantial inaccuracies.[8]

---

   [6] See CBP Data for Resp't Selection, A-570-893, ARP 08-09 (Mar. 30, 2009), Admin. R. Con. Doc. 1 [Pub. Doc. 15].

   [7] [AHSTAC's] Comments on Resp't Selection, A-570-893, ARP 08-09 (Apr. 9, 2009), Admin. R. Con. Doc. 3 [Pub. Doc. 18] ("AHSTAC's Apr. 9, 2009 Comments").

   [8] AHSTAC's Apr. 9, 2009 Comments, Admin. R. Con. Doc. 3 [Pub. Doc. 18] Ex. 1 (U.S. Customs and Border Protection, Report to Congress on (1) U.S. Customs and Border Protection's Plans to Increase AD/CVC Collections and (2) AD/CVD Enforcement Actions and Compliance Initiatives 11 ("Based on an allegation from the domestic shrimp industry, CBP conducted a special operation . . . to determine whether imports of shrimp from China were being misdescribed . . . so that the shipments would fall outside of the scope of the [antidumping duty] order. CBP's operation confirmed the allegation." (describing enforcement of antidumping duties owed for financial year 2007))) & Ex. 2 (U.S. Gov't Accountability Office, GAO-09-258, Seafood Fraud: FDA Program Changes and Better Collaboration Among Key Federal Agencies Could Improve Detection and Prevention 20 (2009) ("CBP and [Immigration and Customs Enforcement]'s investigation found that foreign

The Department refused to consider this evidence. See Resp't Selection Mem., Admin. R. Con. Doc. 8 [Pub. Doc. 41] at 6 ("[AHSTAC]'s references to evidence that CBP data contained flaws in other segments of this proceeding . . . are not on the record of [this] administrative review. Thus, those issues will not be addressed in the context of the information available on the record of the instant administrative review with respect to respondent selection.").

After rejecting AHSTAC's arguments, Commerce, relying exclusively on Type 03 CBP data, selected Zhanjiang Regal Integrated Marine Resources Co. Ltd. ("Regal") and Hilltop International ("Hilltop") as respondents accounting for the

---

manufacturers and importers were . . . attempting to circumvent antidumping duties by sending Chinese shrimp to the United States through Malaysia . . . .")). See also Certain Frozen Warmwater Shrimp from the People's Republic of China, Issues & Decision Mem., A-570-893, ARP 07-08 (Aug. 28, 2009) (adopted in 74 Fed. Reg. 46,565, 46,566 (Dep't Commerce Sept. 10, 2009) (final results and partial rescission of antidumping duty administrative review)) ("AR3 I & D Mem.") Cmt. 7 at 23 ("[A]t verification the Department found that certain importers improperly classified subject entries as non-dutiable."); AHSTAC's Apr. 9, 2009 Comments, Admin. R. Con. Doc. 3 [Pub. Doc. 18] at 5 (discussing the inaccurate reporting of subject entry volume discovered in the third administrative review) & nn. 11-13 (noting that, according to the terms of the Administrative Protective Order issued in the third review, "[i]f business proprietary information that is submitted in [the third administrative review of this antidumping duty order] is relevant to an issue in two consecutive subsequent administrative reviews, an authorized applicant may place such information on the record of those reviews," and affirming that AHSTAC, "an authorized applicant, [was] placing business proprietary information from that segment of the proceeding on the record of this review").

largest volume of subject imports that could reasonably be examined,[9] concluding that Hilltop and Regal were the "largest exporters by volume during the POR." Prelim. Results, 75 Fed. Reg. at 11,855 (citing Resp't Selection Mem., Admin. R. Con. Doc. 8 [Pub. Doc. 41]).

In its Final Results, the Department, over AHSTAC's reiterated objections,[10] continued to rely exclusively on Type 03 CBP data to select respondents accounting for the largest volume of exports of subject merchandise. See 75 Fed. Reg. at 49,460; I & D Mem. Cmt. 1. AHSTAC now challenges this determination.

　　B.　*Commerce Improperly Refused to Consider AHSTAC's Evidence.*

AHSTAC's evidence, as noted above, indicated that Type 03 CBP data, as reported by importers on CBP Form 7501, did not accurately reflect the actual volume of entries subject to this

---

[9] Resp't Selection Mem., Admin. R. Con. Doc. 8 [Pub. Doc. 41] at 8; Certain Frozen Warmwater Shrimp From the People's Republic of China, 75 Fed. Reg. 11,855, 11,855 (Dep't Commerce Mar. 12, 2010) (preliminary partial recision of antidumping duty administrative review and intent not to revoke, in part) ("Prelim. Results").

[10] See [AHSTAC's] Case Br., A-570-893, ARP 08-09 (Apr. 12, 2010), Admin. R. Pub. Doc. 151 ("AHSTAC's Admin. Case Br.") 8-9 ("[E]xclusive reliance on [Type 03] CBP Form 7501 data in spite of significant historic evidence of willful circumvention of the antidumping duty order fails to reasonably identify exporters and producers 'accounting for the largest volume of the subject merchandise from the exporting country that can be reasonably examined' as significant volumes of subject merchandise are likely misclassified by U.S. importers." (quoting 19 U.S.C. § 1677f-1(c)(2))).

Court No. 10-00275                                                         Page 9

order.[11] As further explained below, because this evidence detracts from the weight of the data relied on, and because the Department did not account for this evidence in its determination that Regal and Hilltop were the largest POR exporters/producers by entry volume,[12] the Department's entry volume determinations, and hence its selection of mandatory respondents in this review, were unsupported by substantial evidence. See Universal Camera, 340 U.S. at 488.

As a threshold matter, because Customs officers have a duty to assure the accuracy of information submitted to that agency by penalizing negligent or fraudulent omissions and/or inaccurate submissions,[13] CBP data are presumptively reliable as evidence of respondent-specific POR entry volumes. Pakfood, __ CIT at __, 753 F. Supp. 2d at 1345-46.[14] The record of this review,

---

[11] See supra note 8.

[12] See Resp't Selection Mem., Admin. R. Con. Doc. 8 [Pub. Doc. 41] at 6; I & D Mem. Cmt. 1 at 4.

[13] See 19 C.F.R. § 162.77(a) ("If the [appropriate Customs] Officer has reasonable cause to believe that a violation of [19 U.S.C. 1592 (prohibiting fraudulent and/or negligent submission and/or omission of material information to Customs)] has occurred . . . he shall issue to the person concerned a notice of his intent to issue a claim for a monetary penalty.").

[14] See also id. at 1345 ("In the absence of evidence in the record that the CBP data - for merchandise entered during the relevant POR and subject to the [antidumping] duty order at issue - are in some way inaccurate or distortive, the agency reasonably concluded that such data, collected in the regular course of business under penalty of law for fraud and/or negligence,

Court No. 10-00275                                                Page 10

however, contains evidence sufficient to call this presumptive reliability into question.[15]

Specifically, evidence on the record of this review indicates that, notwithstanding Customs' duty to assure the accuracy of CBP data, the volume of subject merchandise produced/exported by respondents subject to this review and entered during the POR may have been inaccurately reported in CBP Form 7501 data.[16] The fact that, in the immediately preceding

---

presents reliably accurate information." (citing 19 U.S.C. § 1592(a)(1) ("[N]o person, by fraud, gross negligence, or negligence [] (A) may enter, introduce, or attempt to enter or introduce any merchandise into the commerce of the United States by means of [] (i) any document or electronically transmitted data or information, written or oral statement, or act which is material and false, or (ii) any omission which is material, or (B) may aid or abet any other person to violate subparagraph (A)."); id. at §§ 1592(b)(2) & (c) (providing for penalties for violation of § 1592(a)); 19 C.F.R. § 162.79 (same); Seneca Grape Juice Corp. v. United States, 71 Cust. Ct. 131, 142, 367 F. Supp. 1396, 1404 (1973) (noting "the general presumption of regularity that attaches to all administrative action" ("In the absence of clear evidence to the contrary, the courts presume that public officers have properly discharged their duties . . . . This presumption, of course, also attaches to the official actions taken by customs officers.") (citing, inter alia, United States v. Chem. Found., 272 U.S. 1, 14-15 (1926)) (additional citations omitted)).

[15] Cf. A.C. Aukerman Co. v. R.L. Chaides Const. Co., 960 F.2d 1020, 1037 (Fed. Cir. 1992) ("[A] presumption . . . completely vanishes upon the introduction of evidence sufficient to support a finding of the nonexistence of the presumed fact. In other words, the evidence must be sufficient to put the existence of a presumed fact into genuine dispute." (citations omitted)).

[16] See supra note 8; AHSTAC's Admin. Case Br., Admin. R. Pub. Doc. 151 at 5-6 ("The Department has failed to point to any

Court No. 10-00275                                                  Page 11

review, Commerce discovered significant inaccuracies, undetected by Customs, in the CBP entry volume data for subject merchandise from the very same respondents as those covered in this review[17] casts sufficient doubt on the presumption that Customs has assured the accuracy of such data for this POR. See Aukerman, 960 F.2d at 1037; Pakfood, __ CIT at __, 753 F. Supp. 2d at 1345-46. Cf. Home Products Int'l, Inc. v. United States, 633 F.3d 1369, 1380-81 (Fed. Cir. 2011) (determination of data inaccuracies in a separate review of the same producer/exporter, subject to the same antidumping duty order, casts doubt on similar data regarding such producer/exporter in an adjacent review).[18] Accordingly, AHSTAC's evidence must be taken into

---

evidence on the record of this review – or, indeed, provide any logical explanation – for why evasion of the antidumping duty order by misclassification would not have continued during [this POR]."); I & D Mem. Cmt. 1 at 4 (stating, without further explanation, that evidence of entry misclassification, undetected by Customs, in the immediately preceding review of this antidumping duty order "ha[s] no bearing on the instant administrative review"). Compare with Resp't Selection Mem., Admin. R. Con. Doc. 8 [Pub. Doc. 41] at 7 ("[A]bsent information to the contrary, we will continue to treat any affiliated companies found to be collapsible in previous segments as a single entity in the current segment."); see infra note 18.

[17] See AR3 I & D Mem. Cmt. 7 at 23 (discussing inaccuracies discovered in CBP entry volume data for Regal); Resp't Selection Mem., Admin. R. Con. Doc. 8 [Pub. Doc. 41] at 8 (selecting Regal for individual examination in this review).

[18] The court also notes that the Department has acted inconsistently in its treatment of data from prior reviews as evidence of conditions in this POR. On the one hand, the Department relies, in the absence of evidence to the contrary, on

Court No. 10-00275                                                Page 12

account when the Department makes its determinations regarding POR subject entry volumes, prior to respondent selection under 19 U.S.C. 1677f-1(c)(2). See Universal Camera, 340 U.S. at 488.

Because Commerce failed to take into account record evidence that fairly detracts from the weight of the evidence supporting its POR subject entry volume determinations, these determinations are not supported by substantial evidence. Id. This issue is therefore remanded to the agency for reconsideration. Specifically, upon remand, Commerce must take into account the record evidence of significant entry volume inaccuracies in Type 03 CBP Form 7501 data for merchandise subject to this antidumping duty order, and explain why it is nevertheless reasonable to conclude that the Type 03 CBP Form 7501 data used in this case are not similarly inaccurate, and/or otherwise reconsider its determination.[19]

---

the continued accuracy of information on company affiliations from prior reviews. See Resp't Selection Mem., Admin. R. Con. Doc. 8 [Pub. Doc. 41] at 7; Pakfood, __ CIT at __, 753 F. Supp. 2d at 1346-48. But with regard to the discovery that entries subject to this antidumping duty order have been inaccurately reported as non-dutiable in the prior review, the Department does the opposite – it assumes, without evidence, that the inaccurate entry volume reporting discovered in the prior review has not continued into this POR. See I & D Mem. Cmt. 1 at 4.

[19] The court notes in this regard that, as AHSTAC suggested below, see AHSTAC's Admin. Case Br., Admin. R. Pub. Doc. 151 at 10-11, one way to corroborate the accuracy of CBP Type 03 entry volume data without undue administrative burden is to compare such data with CBP Type 01 entry volume data (for merchandise declared to be non-dutiable), for entries of merchandise from

Court No. 10-00275 Page 13

## II. Commerce's Use of Surrogate Value Data from North Korea

### A. Background

During administrative review of antidumping duty orders, Commerce determines dumping margins by comparing the export price of subject merchandise to its normal value. 19 U.S.C. § 1677b(a).[20] For exports from a non-market economy ("NME")[21], however, the "sales of merchandise in such country do not reflect the fair [or normal] value of the merchandise." Id. at § 1677(18)(A). The Department therefore calculates a surrogate value for such merchandise, based on the best available

---

China falling within the scope of tariff codes subject to this antidumping duty order. Such Type 01 data is as readily available to the Department as Type 03 data, see I & D Mem. Cmt. 1 at 3, and thus may be released to interested parties under administrative protective order.

[20] Generally, normal value is the price at which the merchandise is sold in the exporter/producer's home market. Id. at § 1677b(a)(1)(B)(i).

[21] In determining whether a nation's economy is non-market, Commerce considers "(i) the extent to which the currency of the foreign country is convertible into the currency of other countries; (ii) the extent to which wage rates in the foreign country are determined by free bargaining between labor and management; (iii) the extent to which joint ventures or other investments by firms of other foreign countries are permitted in the foreign country; (iv) the extent of government ownership or control of the means of production; (v) the extent of government control over the allocation of resources and over the price and output decisions of enterprises; and (vi) such other factors as [Commerce] considers appropriate." 19 U.S.C. § 1677(18)(B). Once Commerce makes a determination that a particular foreign country operates as an NME, that determination remains in effect until revoked by Commerce. Id. at § 1677(18)(C)(i).

Court No. 10-00275 Page 14

information regarding the relevant factors of production ("FOPs")[22] in one or more developmentally-comparable market economy countries that produce comparable merchandise. Id. at §§ 1677b(c)(1) & (4).[23] The surrogate value calculation approximates normal value by reconstructing the costs of producing comparable merchandise in a comparable market economy.

In this case, because Commerce has determined that China has NME status,[24] the Department calculated such a surrogate 'normal' value for the subject merchandise. Prelim. Results, 75 Fed. Reg. at 11,859. The surrogate value calculation included, among other FOPs, a broad market average[25] for the price of tape imported

---

[22] FOPs include hours of labor required, quantities of raw materials employed, amount of energy and other utilities consumed, and representative capital cost, including depreciation. Id. at § 1677b(c)(3).

[23] Commerce resorts to the calculation of surrogate values if it determines that the available NME information does not permit an appropriate normal value to be determined. Id. at § 1677b(c)(1)(A) & (B).

[24] See Prelim. Results, 75 Fed. Reg. at 11,858; see also Chrome-Plated Lug Nuts From the People's Republic of China, 56 Fed. Reg. 46,153, 46,154 (Dep't Commerce Sept. 10, 1991) (final determination of sales at less than fair value).

[25] See Surrogate Factor Valuations for Preliminary Results, A-507-893, ARP 08-09 (Mar. 8, 2010), Admin. R. Pub. Doc. 136 ("FOP Mem.") 7 & Ex. 17. The Department explained that its "practice when selecting the 'best available information' for valuing FOPs, in accordance with [19 U.S.C. 1677b(c)(1)], is to select, to the extent practicable, [surrogate values] which are publicly available, product-specific, representative of a broad market average, tax-exclusive and contemporaneous with the POR." Id. at 3 (citation omitted). Thus, the Department based much of

Court No. 10-00275                                                          Page 15

from twenty-seven countries into India, the chosen surrogate market economy.[26] Included in this market average of the price of tape imported into India was the price of tape imported from North Korea.[27]

After soliciting comments from interested parties, the Department continued, over AHSTAC's objections,[28] to include WTA data on the price of tape imported into India from North Korea in its surrogate value calculations for the Final Results. See I & D Mem. Cmt. 2 at 5 (disagreeing that the North Korean data should be excluded). AHSTAC now challenges this decision.

    B.   *Commerce's Decision is Sustained*.

The question before the court is whether Commerce reasonably declined to exclude certain prices, listed in the import statics for India, the chosen surrogate market economy, when calculating the average value of a factor for producing the subject

---

the value on information published by the World Trade Atlas ("WTA"). See id. at 2.

   [26] Cf. Fujian Lianfu Forestry Co. v. United States, __ CIT __, 638 F. Supp. 2d 1325, 1349 (2009) (upholding selection of India, in accordance with 19 U.S.C. § 1677b(c)(4), as a market economy that is sufficiently comparable to China to serve as its primary surrogate country for antidumping purposes).

   [27] FOP Mem., Admin. R. Pub. Doc. 136 at Ex. 17.

   [28] See AHSTAC's Admin. Case Br., Admin. R. Pub. Doc. 151 at 19-21 (arguing that the Department should exclude data from North Korea because "the agency clearly has discretion to exclude the values from certain countries . . . even absent a lack of developed administrative case history regarding that country").

Court No. 10-00275                                                    Page 16

merchandise in the surrogate country.  More specifically, the question is whether Commerce should have excluded the price of tape imported from North Korea when reconstructing the cost of producing (and packing) the subject shrimp in India.  As the antidumping statute is silent on this particular question, the court will uphold Commerce's reasonable methodology if it comports with a reasonable reading of the administrative record.

        1.   The Department's Methodology Is Not Contrary to Law.

As noted above, the Department's methodology here was to use a broad market average of prices of FOPs imported into the chosen surrogate market economy.  See also, e.g., Fujian, __ CIT at __, 638 F. Supp. 2d at 1349; Dorbest Ltd. v. United States, 30 CIT 1671, 1686-87, 462 F. Supp. 2d 1262, 1277 (2006).  When relying on WTA import statistics for this purpose, Commerce may not arbitrarily choose which prices to include and which to exclude,[29] even if the data is on exports from known NMEs.  See

---

[29] See Jinan Yipin Corp. v. United States, 31 CIT 1901, 1936, 526 F. Supp. 2d 1347, 1377-78 (2007) (noting with concern that data from certain countries were crossed off from the WTA data used to value FOPs imported into a surrogate country, but remanding based on a broader legal issue); Jinan Yipin Corp. v. United States, __ CIT __, 637 F. Supp. 2d 1183, 1196 (2009) ("Jinan II") (remanding the exclusion of such data from Commerce's FOP valuation); Jinan Yipin Corp. v. United States, __ CIT __, 774 F. Supp. 2d 1238, 1248 (2011) ("Jinan III") (sustaining exclusion of this data once Commerce supported the exclusion with "explicit findings that export subsidies existed [for the relevant imports from such countries] during the time period corresponding to the POR").

Court No. 10-00275 Page 17

Jinan II, __ CIT at __, 637 F. Supp. 2d at 1189 (explaining that NME-origin merchandise may be imported into a market economy at market price).[30]

As there is nothing in the antidumping statute, or the Department's regulations and practice,[31] to render this approach unreasonable, the court concludes that the Department's methodology in this respect is not contrary to law. See Chevron, 467 U.S. at 842; Jinan III, __ CIT __, 774 F. Supp. 2d at 1248.

2. The Department's Methodology Was Reasonably Applied In This Case.

AHSTAC submitted no evidence to support its contention that

---

[30] The court notes that using import statistics for the chosen surrogate market economy, to obtain the average value of certain materials so as to reconstruct the cost of producing comparable merchandise in the surrogate market economy, does not carry the same likelihood of market price distortion, even if some of those imports may have come from what may potentially be NME countries, as using the price of the subject merchandise in an NME for that merchandise's normal value when calculating a dumping margin. The court also notes that, even in the latter scenario, the exclusion of price data from the NME is not automatic. See 19 U.S.C. § 1677b(c)(1) ("If (A) the subject merchandise is exported from a nonmarket economy country, *and (B) [Commerce] finds that available information does not permit the normal value of the subject merchandise to be determined under subsection (a) of this section* [i.e., by using the price at which the foreign like product is first sold for consumption in the NME country], [then] [Commerce] shall determine the normal value of the subject merchandise on the basis of [FOPs in a surrogate market economy].") (emphasis added).

[31] The Department acknowledges that certain of its prior determinations have been aberrational with regard to the policy explained in ITA Policy Bulletin 03.1, see I & D Mem. Cmt. 2 at 5, and "seeks to avoid a similar error here." Id.

Court No. 10-00275 Page 18

the WTA data on tape imported into India from North Korea actually contained distorted prices. See generally AHSTAC's Admin. Case Br., Admin. R. Pub. Doc. 151. Even assuming, *arguendo*, that North Korea operates as a non-market economy,[32] the agency reasonably requires that, for antidumping purposes, the determination to exclude from its calculations relevant price data on FOPs imported into a surrogate market economy must be supported with specific evidence of distortive effect. Cf. Jinan III, __ CIT at __, 774 F. Supp. 2d at 1248 (sustaining exclusion of the price of certain imported FOPs only once supported with "explicit findings" that such prices were likely distorted "during the time period corresponding to the POR").

Commerce's decision not to exclude this data was therefore supported by a reasonable reading of the record, as nothing in the record indicated that including such data would have a

---

[32] See Mem. L. Supp. Pl.'s Rule 56.2 Mot. for J. on Agency R. 30-31 (citing a report from the Congressional Research Service, discussing United States policy of curtailing trade with North Korea due to, *inter alia*, "its status as a Communist country and a nonmarket economy," and federal legislation that deems North Korea ineligible for non-humanitarian foreign assistance, due to its status as a communist country). The court notes, however, that no similar references were provided to Commerce in support of AHSTAC's argument below. The Department has never made a determination, for antidumping purposes, regarding the status of North Korea's economy. See I & D Mem., Cmt. 2 at 5; AHSTAC's Admin. Case Br., Admin. R. Pub. Doc. 151 at 20 (agreeing that "the agency has not had the occasion to confirm in a regulatory procedure [whether] North Korea operates a non-market economy country [for purposes of the antidumping law]").

distortive effect on the surrogate value calculation. See <u>Nippon Steel</u>, 458 F.3d at 1351.

## CONCLUSION

For all the foregoing reasons, the Department's <u>Final Results</u>, 75 Fed. Reg. 49,460, are remanded to the agency solely with regard to the determinations of subject entry volumes for purposes of respondent selection under 19 U.S.C. § 1677f-1(c)(2). Upon remand, the Department shall reconsider and provide additional explanation for, and/or modification to,[33] such determinations, consistent with this opinion.

Commerce shall have until October 24, 2011 to complete and file its remand redetermination. Plaintiff shall have until November 23, 2011 to file comments. Defendant and Defendant-Intervenors shall have until December 8, 2011 to file any reply.

It is **SO ORDERED**.

                                                           /s/ Donald C. Pogue
                                            Donald C. Pogue, Chief Judge

Dated:   August 24, 2011
        New York, N.Y.

---

[33] The court notes that, in the event that the Department's selection of mandatory respondents is modified upon remand, Defendant-Intervenor Hilltop requests to retain the dumping margin assigned to it upon its individual investigation in this review. See Def.-Intervenors' Resp. in Opp'n to Pl.'s Rule 56.2 Mot. for J. Upon Agency R. 11. The court reserves judgment on this question until such time as it becomes relevant to the disposition of a ripe legal issue. See <u>Tokyo Kikai Seisakusho, Ltd. v. United States</u>, 529 F.3d 1352, 1362 (Fed. Cir. 2008).