Slip Op. 14 - 55

UNITED STATES COURT OF INTERNATIONAL TRADE

```
AD HOC SHRIMP TRADE ACTION
COMMITTEE,

        Plaintiff,

              v.

UNITED STATES,

        Defendant,

              and

HILLTOP INTERNATIONAL and OCEAN
DUKE CORP.,

        Defendant-Intervenors.
```

**PUBLIC VERSION**

Before: Donald C. Pogue,
            Chief Judge

Court No. 10-00275
Court No. 11-00335

OPINION

[affirming two remand redeterminations]

Dated: May 20, 2014

Andrew W. Kentz, Jordan Charles Kahn, Nathaniel Maandig Rickard and Nathan W. Cunningham, Picard Kentz & Rowe LLP, of Washington, DC, for the Plaintiff.

Joshua E. Kurland, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, DC, for the Defendant.  With him on the briefs were Stuart Delery, Assistant Attorney General, Jeanne E. Davidson, Director, and Patricia M. McCarthy, Assistant Director.  Of counsel on the briefs was Melissa M. Brewer, Attorney, Office of the Chief Counsel for Trade Enforcement and Compliance, U.S. Department of Commerce, of Washington, DC.

Mark E. Pardo and Andrew T. Schutz, Grunfeld, Desiderio, Lebowitz, Silverman & Klestadt LLP, of Washington, DC, for the Defendant-Intervenors.

**Pogue, Chief Judge:**  This opinion addresses litigation arising out of the fourth and fifth administrative reviews of an antidumping duty order covering certain warmwater shrimp from the People's Republic of China ("PRC" or "China").  During the subsequent sixth administrative review of this order, Commerce found that respondent Hilltop International ("Hilltop") had made material misrepresentations regarding its affiliations and corporate structure throughout the entire history of the order.[1] At the time of this finding, liquidation of entries covered by the fourth and fifth administrative reviews remained enjoined pending the final outcome of judicial review.[2]  Concluding that the evidence of Hilltop's misconduct was equally applicable to the fourth and fifth reviews, Commerce requested and was granted permission to reopen the records of those reviews in order to consider the effect of this new evidence on Hilltop's calculated dumping margins.[3]  Hilltop now challenges the results of

---

[1] See Issues & Decision Mem., A-570-893, ARP 10-11 (Aug. 27, 2012) accompanying Certain Frozen Warmwater Shrimp from the People's Republic of China, 77 Fed. Reg. 53,856 (Dep't Commerce Sept. 4, 2012) (final results, partial rescission of sixth antidumping duty administrative review and determination not to revoke in part) ("AR6 I & D Mem.") cmt. 1 at 12-17.

[2] See Order Granting Consent Mot. Prelim. Inj., Ct. No. 10-00275, ECF No. 11; Order Granting Consent Mot. Prelim. Inj., Ct. No. 11-00335, ECF No. 10.

[3] See Order Remanding Certain Frozen Warmwater Shrimp from the People's Republic of China, 75 Fed. Reg. 49,460 (Dep't Commerce
(footnote continued)

Commerce's redeterminations.[4]

The court has jurisdiction pursuant to Section 516A(a)(2)(B)(iii) of the Tariff Act of 1930, as amended, 19 U.S.C. § 1516a(a)(2)(B)(iii) (2006),[5] and 28 U.S.C. § 1581(c) (2006).

As explained below, Commerce's reasonable determination not to rely on Hilltop's representations, and to therefore treat Hilltop as part of the PRC-wide entity in the fourth review, is sustained on the same grounds as those supporting the affirmance of Commerce's essentially identical

---

Aug. 13, 2010) (final results and partial rescission of antidumping duty administrative review) ("AR4 Final Results") and accompanying Issues & Decision Mem., A-570-893, ARP 08-09 (Aug. 9, 2010) ("AR4 I & D Mem."), Ct. No. 10-00275, ECF No. 71; Order Granting Mot. Expand Scope of Remand of Certain Frozen Warmwater Shrimp from the People's Republic of China, 76 Fed. Reg. 51,940 (Dep't Commerce Aug. 19, 2011) (final results and partial rescission of antidumping duty administrative review) ("AR5 Final Results") and accompanying Issues & Decision Mem., A-570-893, ARP 09-10 (Aug. 12, 2011) ("AR5 I & D Mem."), Ct. No. 11-00335, ECF No. 70.

[4] Because Hilltop's challenges to the (revisited) fourth and fifth reviews present identical legal issues, as applied to essentially identical facts, this single opinion is addressed to both legal actions. A third action, challenging essentially identical determinations in the sixth administrative review, has been stayed pending the final outcome of any appeals from this decision. See Order Apr. 23, 2014, Ct. No. 12-00289, ECF No. 80.

[5] Further citations to the Tariff Act of 1930, as amended, are to the relevant provisions of Title 19 of the U.S. Code, 2006 edition.

determination in the (revisited) fifth review.[6]  In addition,
Commerce's corroboration analysis, supporting the use of the
112.81 percent countrywide rate in the revised results of the
fourth and fifth reviews, is also sustained.

### PROCEDURAL BACKGROUND

Because the results of the fifth review were already
being reconsidered pursuant to remand at the time that new
evidence of Hilltop's misconduct came to light during the sixth
review, Commerce's decision regarding the effect of this new
evidence on Hilltop's margin calculations came to court first on
the (reopened) record of the fifth review.  Reexamining this
supplemented record, Commerce determined that Hilltop had
misrepresented information regarding the scope of its affiliates
and corporate structure, and moreover that the circumstances of
these misrepresentations – in particular Hilltop's failure to
provide a persuasive explanation for the material errors, as
well as its refusal to answer Commerce's follow-up questions
regarding potential as-yet undisclosed affiliates – were such
that Hilltop's remaining representations regarding corporate
ownership and control were not reliable.[7]  Because Commerce had

---

[6] See Ad Hoc Shrimp Trade Action Committee v. United States,
__ CIT __, 925 F. Supp. 2d 1315, 1319-24 (2013) ("Ad Hoc II").

[7] See Ad Hoc II, __ CIT __, 925 F. Supp. 2d at 1318-19
(footnote continued)

initially granted Hilltop separate rate status based solely on

these no longer reliable representations, it accordingly

determined that Hilltop had failed to submit reliable evidence

to rebut the presumption of government control attaching to all

exporters covered by this antidumping duty order.[8]  Commerce

consequently assigned to Hilltop the 112.81 percent countrywide

rate, which was derived from the petition to initiate these

proceedings (the "Petition") and last corroborated during

Commerce's initial investigation into unfair pricing (the less

than fair value or "LTFV" investigation).[9]

Commerce's unreliability determination and decision in

the fifth review to assign the PRC-wide rate to Hilltop were

affirmed on judicial review.[10]  However, Commerce's (re-

---

(discussing Final Results of Redetermination Pursuant to Court
Remand, Ct. No. 11-00335, ECF No. 74 ("AR5 1st Remand
Results")).

[8] Ad Hoc II, __ CIT __, 925 F. Supp. 2d at 1318-19, 1322-24.
Commerce presumes that all exporters from non-market economy
("NME") countries like China operate under government control
and hence requires respondents to submit reliable evidence to
the contrary in order to receive an antidumping duty rate that
is separate from the countrywide entity ("separate rate
status"). Transcom, Inc. v. United States, 294 F.3d 1371, 1373
(Fed. Cir. 2002) (citing Sigma Corp. v. United States, 117 F.3d
1401 (Fed. Cir. 1997) (affirming this practice)).

[9] Ad Hoc II, __ CIT __, 925 F. Supp. 2d at 1318-19, 1324-25.

[10] Id. at 1324 (sustaining Commerce's determination to deny
separate rate status to Hilltop in the fifth review).

determined) results of the fifth review were remanded for
reconsideration of the corroboration analysis Commerce used to
satisfy itself that the countrywide rate derived from the
Petition had probative value with respect to the likely pricing
behavior of the non-cooperating PRC-wide entity.[11]  Commerce then
revisited its corroboration analysis, the results of which are
one of the matters now before the court.[12]

     Meanwhile, the (revisited) results of the fourth
review – wherein Commerce made essentially identical findings
and conclusions with respect to Hilltop, based on identical
evidence, as it did in the (revisited) fifth review – are also
before the court.[13]  In its redetermination of Hilltop's
antidumping duty assessment rate in the fourth review, Commerce
also revisited its corroboration of the countrywide rate, which

---

[11] Id. at 1326-27. See 19 U.S.C. 1677e(c) (requiring Commerce to
"corroborate" "secondary information," defined as "information
[other than that] obtained in the course of an investigation or
review"); Statement of Administrative Action accompanying the
Uruguay Round Agreements Act, H.R. Doc. No. 103-316 (1994)
("SAA") at 870 (explaining that "secondary information" includes
"information derived from the petition that gave rise to the
[LTFV] investigation or [subsequent administrative] review," and
further explaining that "corroboration" within the meaning of
Section 1677e(c) requires that Commerce satisfy itself of the
information's "probative value").

[12] See Results of Redetermination Pursuant to Court Remand,
Ct. No. 11-00335, ECF No. 106-1 ("AR5 2d Remand Results").

[13] See Final Results of Redetermination Pursuant to Court Remand,
Ct. No. 10-00275, ECF No. 77-1 ("AR4 Remand Results").

it assigned to Hilltop also in that revisited review.  This

corroboration analysis (as well as the countrywide rate itself)

is identical to that employed pursuant to remand of the results

of the fifth review.[14]  Hilltop now challenges Commerce's

unreliability determination and decision to assign to Hilltop

the PRC-wide rate in the fourth review, as well as Commerce's

corroboration analysis for the countrywide rate in both the

(revisited) fourth and fifth reviews.[15]

## STANDARD OF REVIEW

The court will sustain Commerce's antidumping

determinations, including redeterminations made pursuant to

remand, so long as such determinations are supported by

substantial evidence, are otherwise in accordance with law and,

in the case of redeterminations, are consistent with the court's

remand order. See 19 U.S.C. § 1516a(b)(1)(B)(i); Trust Chem Co.

v. United States, __ CIT __, 819 F. Supp. 2d 1373, 1378 (2012).

Substantial evidence refers to "such relevant evidence as a

reasonable mind might accept as adequate to support a

conclusion," SKF USA, Inc. v. United States, 537 F.3d 1373, 1378

---

[14] Compare AR4 Remand Results at 29-34, with AR5 2d Remand
Results at 3-7.

[15] Def.-Intervenors' Comments in Opp'n to Final Remand Results,
Ct. No. 10-00275, ECF No. 83 ("Hilltop's AR4 Br."); Def.-
Intervenors' Comments in Opp'n to Final Remand Results,
Ct. No. 11-00335, ECF No. 110 ("Hilltop's AR5 Br.").

(Fed. Cir. 2008) (quoting Consol. Edison Co. v. NLRB, 305 U.S.

197, 229 (1938) (defining "substantial evidence")), and the

substantial evidence standard of review can be roughly

translated to mean "is the determination unreasonable?" Nippon

Steel Corp. v. United States, 458 F.3d 1345, 1351

(Fed. Cir. 2006) (internal quotation and alteration marks and

citation omitted).  "The specific determination we make is

whether the evidence and reasonable inferences from the record

support" Commerce's findings. Daewoo Elecs. Co. v. United

States, 6 F.3d 1511, 1520 (Fed. Cir. 1993) (internal quotation

marks and citation omitted).

## DISCUSSION

I. Context

        In initiating each of these reviews, Commerce

reiterated its policy of assigning to all exporters and

producers from NME countries – including China – a single

countrywide antidumping duty rate unless respondents qualify for

"separate rate status" by affirmatively demonstrating freedom

from government control over export activities.[16]  Also in each

---

[16] See Certain Frozen Warmwater Shrimp from the Socialist
Republic of Vietnam and the People's Republic of China, 74 Fed.
Reg. 13,178, 13,178-79 (Dep't Commerce Mar. 26, 2009) (notice of
initiation of administrative reviews and requests for revocation
in part); Certain Frozen Warmwater Shrimp from the Socialist
Republic of Vietnam and the People's Republic of China, 75 Fed.

(footnote continued)

review, Commerce preliminarily granted Hilltop separate rate
status based on Hilltop's representations that it is located in
Hong Kong (which is treated as a market economy) and that
neither it nor any of its Chinese affiliates are controlled by
any government entity.[17]

Subsequently, however, in the course of the sixth
administrative review, Commerce discovered that Hilltop's part
owner and general manager (To Kam Keung or "Mr. To") had
incorporated, invested significant funds in, and served on the
board of an undisclosed Cambodian affiliate (Ocean King
(Cambodia) Company Limited or "Ocean King").  Hilltop had
repeatedly certified the contrary to Commerce throughout the
prior history of this antidumping duty order.  Not only did
Hilltop fail to disclose this affiliation in its initial
responses to Commerce's inquiries in all segments of this
antidumping proceeding, but Hilltop then also explicitly denied

---

Reg. 18,154, 18,154-55 (Dep't Commerce Apr. 9, 2010) (notice of
initiation of administrative reviews and requests for revocation
in part). See also supra note 8.

[17] See Certain Frozen Warmwater Shrimp from the People's Republic
of China, 75 Fed. Reg. 11,855, 11,858-59 (Dep't Commerce
Mar. 12, 2010) (preliminary results, preliminary partial
rescission of antidumping duty administrative review and intent
not to revoke, in part) ("AR4 Prelim. Results"); Certain Frozen
Warmwater Shrimp from the People's Republic of China, 76 Fed.
Reg. 8338, 8341 (Dep't Commerce Feb. 14, 2011) (preliminary
results and preliminary partial rescission of fifth antidumping
duty administrative review) ("AR5 Prelim. Results").

the affiliation's existence when questioned specifically about
Ocean King on multiple occasions.  Only after Commerce obtained
and placed on the record public registration documents showing
Mr. To to have incorporated and invested large sums in Ocean
King did Hilltop concede that, contrary to Mr. To's repeated
affirmations denying any knowledge of an affiliation with or
investment in Ocean King, Hilltop was in fact affiliated with
Ocean King throughout the history of this order.[18]

        Hilltop provided no explanation of its failure to
disclose and subsequent repeated denial of its affiliation with
Ocean King beyond a vague statement that the error may have been
due to Mr. To's lack of personal involvement with Ocean King
(despite unequivocal record evidence of his personal involvement
and substantial investment during Ocean King's incorporation),
"or for whatever reason."[19]  Moreover, beyond admitting that

_____

[18] See AR6 I & D Mem. at 3-6; AR5 1st Remand Results at 11-13
(relying on Hilltop's representations during the fifth review
and the new evidence from the sixth review); AR4 Remand Results
at 11-13 (relying on Hilltop's representations during the fourth
review and the new evidence from the sixth review). See also Ad
Hoc II, __ CIT __, 925 F. Supp. 2d at 1318, 1321-24 (discussing
the evidence, first placed on record during the sixth review,
that was subsequently added to the record of the fifth (as well
as the fourth) review).

[19] See AR6 I & D Mem. cmt. 1 at 16 (quoting Hilltop's
representation during the sixth review); AR5 1st Remand Results
at 19 (same); AR4 Remand Results at 20 (same). See also Ad Hoc
II, __ CIT __, 925 F. Supp. 2d at 1323 (discussing this
evidence).

which was irrefutably demonstrated by the record evidence,

Hilltop refused to respond to Commerce's follow-up inquiries

regarding possible additional undisclosed affiliations.[20]

In all three administrative review proceedings,

Commerce determined that the circumstances of Hilltop's non-

disclosure, outright denial, and ultimate admission to an

undisclosed affiliation with Ocean King were such that the

agency could no longer rely on Hilltop's prior representations

regarding its corporate structure and freedom from government

control, the accuracy of which had been certified by the same

Mr. To whose credibility was impeached when the record revealed

his personal involvement with Ocean King despite having

repeatedly sworn the contrary to Commerce.[21]  Having found the

representations that had formed the basis for Hilltop's separate

rate status to be undermined, Commerce decided that Hilltop had

failed to affirmatively demonstrate its eligibility for a

separate rate and therefore assigned to Hilltop the countrywide

rate in each of these proceedings. Id.

---

[20] See AR6 I & D Mem. cmt. 1 at 17 & n.80, 18 & n.85; AR5 Remand
Results at 8, 21 & n.83, 44-47; AR4 Remand Results at 8, 21-24.
See also Ad Hoc II, __ CIT __, 925 F. Supp. 2d at 1323 & n.35
(discussing the evidence).

[21] See AR6 I & D Mem. cmt. 1 at 16-17; AR5 1st Remand Results
at 17-22 (relying on the new evidence from the sixth review);
AR4 Remand Results at 17-26 (same).

II.  Commerce's Determination to Assign to Hilltop the
     Countrywide Rate in the Fourth and Fifth Reviews

     Commerce may disregard deficient submissions and "use

the facts otherwise available" when a respondent withholds

requested information or otherwise significantly impedes the

administrative review and fails to either explain or adequately

remedy the deficiency. 19 U.S.C. §§ 1677e(a)(2), 1677m(d);

Jiangsu Changbao Steel Tube Co. v. United States, __ CIT __,

884 F. Supp. 2d 1295, 1302 (2012).  Here, Commerce found that

Hilltop's representations regarding its corporate structure,

ownership, and control were deficient because they contained

false information, which Hilltop repeatedly refused to correct

until faced with irrefutable evidence to the contrary.[22]  Because

Hilltop failed to persuasively explain the circumstances

surrounding, or its motivation for, withholding not only that

information to which it was ultimately forced to admit but also

additional requested information regarding its corporate

structure and ownership, Commerce determined to disregard

Hilltop's remaining representations concerning its ownership and

control as unreliable. Id.

     In the absence of a reliable affirmative demonstration

of freedom from government control through Hilltop's disclosed

---

[22] See *supra* note 18. See also AR6 I & D Mem. cmt. 1 at 12-17;
AR5 Remand Results at 16-22; AR4 Remand Results at 16-26.

and possibly additional undisclosed Chinese affiliates,[23]

Commerce presumed – as it does with respect to all NME

respondents who fail to demonstrate freedom from government

control[24] – that Hilltop was part of the countrywide entity.[25]

        In its challenge, Hilltop argues, first, that Commerce

improperly disregarded those of Hilltop's representations that

formed the basis for its separate rate status in the fourth

review[26] because Hilltop's non-disclosure of an affiliation with

Ocean King was immaterial, asserting that Ocean King was not

involved in the production of subject merchandise during the

POR.[27]  Although record evidence indicates that Ocean King was

likely involved in the repackaging and re-export of shrimp

subject to U.S. antidumping duties,[28] suggesting at least the

---

[23] See *supra* note 20 (citing to Commerce's discussion of
Hilltop's refusal to respond to the agency's follow-up inquiries
regarding possible additional undisclosed affiliations).

[24] See *supra* note 8.

[25] See *supra* note 21.

[26] Note that Commerce's decision to disregard the representations
that had formed the basis for Hilltop's separate rate status in
the fifth review was sustained in Ad Hoc II, __ CIT __,
925 F. Supp. 2d at 1324.

[27] See Hilltop's AR4 Br. at 7-20.

[28] See, e.g., Ex. 1 to Ad Hoc Shrimp Trade Action Committee's
Comments on [Commerce's] Preliminary Determination to Grant
Hilltop's Request for Company-Specific Revocation Pursuant to
19 C.F.R. 351.222(b)(2) and Comments in Anticipation of
Hilltop's Forthcoming Verification, A-570-893, ARP 10-11
                                        (footnote continued)

possibility of additional undisclosed involvement in the

production and sale of subject merchandise, Commerce did not

make (and need not have made) a finding that Ocean King was in

fact so involved.  Contrary to Hilltop's characterizations,

Commerce's decision to invalidate Hilltop's separate rate

representations as unreliable was not based on a definitive

finding of transshipment, but rather on the impeachment of

Hilltop's credibility as a consequence of evidence reasonably

indicating that Hilltop deliberately withheld and misrepresented

information requested of it, which misrepresentation may

reasonably be inferred to pervade the data in the record beyond

that which Commerce has positively confirmed as misrepresented.[29]

Thus the material information that Commerce ultimately

found to be missing from the record was a reliably accurate

---

(Mar. 12, 2012), reproduced in, e.g., App. of Docs. Supporting
Def.'s Resp. Comments Regarding Remand Results,
Ct. No. 10-00275, ECF No. 110-4 at Tab 9, at Attachs. 14
(internal emails discussing whether shrimp sent to Ocean King
from the Socialist Republic of Vietnam (which, like the subject
merchandise from China, were also subject to U.S. antidumping
proceedings) should "reuse all white cartons of Vietnam and
stick MC labels in Cambodia" or instead "print new master
cartons for Cambodia origin products" rather than "sticker[ing]
over Product of Vietnam cartons"), 19 (internal email in which
Mr. To discusses Ocean King's establishment) and 20 (internal
email cautioning Mr. To that Hilltop's predecessor-in-interest
"cannot have any Involve [sic] or any paper related! [to Ocean
King]").

[29] See supra note 18.

representation of Hilltop's corporate structure and the extent

of government control potentially exercised through its Chinese

affiliates.[30]  Because the accuracy of all representations in

this regard was certified by Mr. To, who also certified the

accuracy of repeated false statements in response to direct

inquiries regarding Ocean King, Commerce reasonably discredited

these representations as unreliable.[31]  Commerce repeatedly

requested Hilltop to provide information specifically about its

affiliation with Ocean King, which Hilltop repeatedly falsely

---

[30] See *supra* note 22.

[31] See AR6 I & D Mem. cmt. 1 at 12. ("Because Hilltop repeatedly
made material misrepresentations with regard to its
affiliations, while certifying to the accuracy of such false
information, and because Hilltop refused our repeated requests
for information that was relevant to our analysis, we find that
we cannot rely on any of the information submitted by Hilltop in
this review."); AR5 1st Remand Results at 23-24 (same);
AR4 Remand Results at 28 (same). Cf. Changbao, __ CIT at __,
884 F. Supp. 2d at 1309 (holding that, to the extent that a
respondent's submissions contain solely representations made by
that respondent, the conclusion that such representations are
unreliable follows logically from Commerce's finding that the
company officer(s) who certified the accuracy of such
representations were themselves unreliable sources of truthful
and accurate information).
     While Hilltop emphasizes independent record evidence that
it is registered in Hong Kong, see, e.g., Hilltop's AR4 Br.
at 24-33 (relying on evidence of Hilltop's Hong Kong Business
License and Hilltop's Hong Kong Business Registration Form),
Hilltop's registration in Hong Kong is not in itself dispositive
because it does not address the potential for government control
through Hilltop's disclosed and possibly additional undisclosed
PRC affiliates. Ad Hoc II __ CIT at __, 925 F. Supp. 2d at 1324
n.39.

denied.[32]  The material information that was withheld, therefore,

is not merely the undisclosed affiliation with Ocean King, but

also all other complete and accurate information which Hilltop

failed to provide in response to Commerce's repeated attempts at

clarification until Hilltop finally was faced with irrefutable

evidence to the contrary.[33]

        Similarly, Hilltop also argues that Commerce

improperly discredited the totality of Hilltop's representations

regarding corporate ownership and government control based on

Hilltop's concealment of an affiliation with Ocean King because

this affiliation did not concern a "core," rather than purely

"tangential," area of Commerce's antidumping analysis.[34]  But

---

[32] See AR6 I & D Mem. at 3-4; see also supra note 18.

[33] Cf. Changbao, __ CIT at __, 884 F. Supp. 2d at 1306 ("It is
reasonable for Commerce to infer that a respondent who admits to
having intentionally deceived Commerce officials, and does so
only after Commerce itself supplies contradictory evidence,
exhibits behavior suggestive of a general willingness and
ability to deceive and cover up the deception until exposure
becomes absolutely necessary. . . .  [I]n the absence of
additional reassurance or an explanation sufficient to
rehabilitate [the respondent]'s damaged credibility, Commerce
ha[s] no way of knowing whether or not [the respondent] may have
been less than straightforward with regard also to its remaining
submissions and representations . . . .").

[34] Hilltop's AR4 Br. at 20-24 (relying on Shanghai Taoen Int'l
Trading Co. v. United States, 29 CIT 189, 199 n.13, 360 F. Supp.
2d 1339, 1348 n.13 (2005); Foshan Shunde Yongjian Housewares &
Hardware Co. v. United States, No. 10-00059, 2011 WL 4829947
(CIT Oct. 12, 2011)). See Shanghai Taoen, 29 CIT at 199 n.13,
360 F. Supp. 2d at 1348 n.13 (holding that where Commerce finds
                                            (footnote continued)

again, this is not a case of inadvertent omission of tangential information.  Hilltop did not merely omit an affiliation in its initial accounting to Commerce.  First, Hilltop misrepresented its corporate structure – stating that none of its managers held any positions or investments in any undisclosed firm when its part owner and general manager was in fact a board member and shareholder at Ocean King, an undisclosed affiliate.[35]  And then Hilltop additionally and explicitly denied numerous subsequent inquiries regarding this undisclosed affiliation, repeatedly certifying to Commerce that it had no additional affiliations, and even specifically stating that "Hilltop is not affiliated with Ocean King" and that "neither the company, nor its owners or officers, invested any funds in Ocean King."[36]  In reality, as

---

a respondent to be not credible with regard to "core, not tangential" information, the agency may reasonably disregard the totality of information submitted by the discredited respondent because "there is little room for substitution of partial facts"); Foshan, 2011 WL 4829947 at *14 (holding that Commerce reasonably determined to disregard the entirety of a respondent's factors of production and sales information where inaccuracies with respect to "core, not tangential" information pervaded the respondent's responses to Commerce's inquiries) (quoting Since Hardware (Guangzhou) Co. v. United States, No. 09-00123, 2010 WL 3982277, at *7 (CIT Sept. 27, 2010) (quoting Shanghai Taoen, 29 CIT at 199 n.13, 360 F. Supp. 2d at 1348 n.13)).

[35] See supra note 18.

[36] Hilltop's Reply to Pet'rs' Resp. to CBP Import Data, A-570-893, ARP 10-11 (May 31, 2012) at 6, reproduced in, e.g., Public App. to Pl. Ad Hoc Shrimp Trade Action Committee's Reply
                                          (footnote continued)

Hilltop was eventually forced to admit, Hilltop's part owner and general manager – the same person who certified the accuracy of all of Hilltop's submissions in these reviews[37] – was both a board member and substantial shareholder in Ocean King during all three periods of review.[38]

Also contrary to Hilltop's contentions, the Cambodian location of Ocean King and Commerce's silence regarding whether there were any entries of shrimp from Cambodia during the relevant time periods do not make Hilltop's false statements "tangential" rather than "core."  What places Hilltop's false statements at the core of Commerce's analysis is that Mr. To repeatedly certified the accuracy of Hilltop's representations regarding its corporate structure while either knowing that these representations were false or else exhibiting gross negligence in failing to keep himself informed as to the nature and extent of his company's affiliations.  Whether through fraudulent concealment of the truth or through negligent inability to be informed of the relevant facts, Mr. To's certifications regarding the accuracy of the corporate structure

---

to Comments on Final Results of Redetermination Pursuant to Ct. Remand, Ct. No. 10-00275, ECF No. 108-1 at Tab 12.

[37] See AR6 I & D Mem. cmt. 1 at 16; AR5 1st Remand Results at 19-20; AR4 Remand Results at 20.

[38] See supra note 18.

represented in the submissions whose accuracy he certified are

no longer reliable.  Rather than reflecting a tangential matter,

these circumstances clearly concern the core of the accuracy and

reliability of Hilltop's remaining statements to Commerce

regarding its corporate structure, which had formed the basis

for Commerce's preliminary separate rate determinations.[39]

Having discredited these statements as unreliable, Commerce

reasonably concluded that the record presented no reliable

evidence of Hilltop's freedom from presumed government control

and therefore reasonably assigned Hilltop the countrywide rate.

See Transcom, 294 F.3d at 1373; Changbao, __ CIT at __,

884 F. Supp. 2d at 1309-12.

       Accordingly, Commerce's determination to assign to

Hilltop the PRC-wide antidumping duty assessment rate in the

fourth review is sustained on the same grounds as those

supporting the court's affirmance of Commerce's identical

determination in the revised results of the fifth review. See Ad

Hoc II, __ CIT __, 925 F. Supp. 2d at 1319-24.


III. Corroboration of the PRC-wide Rate Assigned to Hilltop in
     the Fourth and Fifth Reviews

       A. AR5 Remand Order

       Although the court sustained Commerce's decision to

---

[39] See *supra* note 17.

apply the countrywide rate to Hilltop in the fifth review,

Commerce's corroboration of this PRC-wide rate – which had

initially been based on data from the LTFV investigation and, in

the absence of evidence rebutting the presumption of continued

validity, see KYD, Inc. v. United States, 607 F.3d 760, 767

(Fed. Cir. 2010)[40], carried over into every subsequent review –

was remanded because the margin calculations on which Commerce's

original corroboration was based were subsequently altered

pursuant to judicial review, ultimately reducing the comparison

margins. See Ad Hoc II, __ CIT at __, 925 F. Supp. 2d at 1325-

27.  The court required that, "[o]n remand, Commerce must either

adequately corroborate the 112.81 percent rate and explain how

---

[40] (discussing "[t]he presumption that a prior dumping margin
imposed against an exporter in an earlier administrative review
continues to be valid if the exporter fails to cooperate in a
subsequent administrative review"); see also id. at 766
("Commerce is permitted to use a 'common sense inference that
the highest prior margin is the most probative evidence of
current margins because, if it were not so, the importer,
knowing of the rule, would have produced current information
showing the margin to be less.'") (quoting Rhone Poulenc, Inc.
v. United States, 899 F.2d 1185, 1190 (Fed. Cir. 1990) (emphasis
in original)) (also quoting Ta Chen Stainless Steel Pipe, Inc.
v. United States, 298 F.3d 1330, 1339 (Fed. Cir. 2002) ("In
cases in which the respondent fails to provide Commerce with the
most recent pricing data, it is within Commerce's discretion to
presume that the highest prior margin reflects the current
margins.")); AR4 Prelim. Results, 75 Fed. Reg. at 11,859 ("For
the China-wide entity, we have assigned the entity's current
rate and the only rate ever determined for the entity in this
proceeding.") (unchanged in AR4 Final Results, 75 Fed. Reg. at
49,463); AR5 Prelim. Results, 76 Fed. Reg. at 8342 (same)
(unchanged in AR5 Final Results, 76 Fed. Reg. at 51,942).

its corroboration satisfies the requirements of 19 U.S.C.

1677e(c), or else calculate or choose a different countrywide

rate that better reflects commercial reality, as supported by a

reasonable reading of the record evidence." Id. at 1327.

> B. *The Corroboration Analysis in the* AR5 2d Remand
> Results *and* AR4 Remand Results

In its remand proceedings concerning the fourth and

fifth reviews, Commerce revisited its corroboration of the PRC-

wide rate.  Acknowledging that the margins used to initially

corroborate this rate in the LTFV investigation (which

corroboration analysis was then relied upon in all subsequent

reviews) were altered following judicial review, Commerce

employed record data that were recalculated to reflect any

changes that were made pursuant to litigation. AR5 2d Remand

Results at 8; AR4 Remand Results at 35.[41]  Specifically, Commerce

employed a file that was created in connection with a recent

Section 129 proceeding,[42] implementing the outcome of dispute

---

[41] The data were also recalculated "to allow offsets for non-
dumped sales," pursuant to the outcome of dispute settlement
before the World Trade Organization's ("WTO") Dispute Settlement
Body ("DSB"). Id.

[42] "Section 129" refers to proceedings undertaken in response to
a decision by the WTO's DSB that some particular determination
by a U.S. trade agency was not consistent with the United
States' obligations as a Member of the WTO's Antidumping and/or
Subsidies and Countervailing Measures Agreements. See 19 U.S.C.
§ 3538(b); see generally Andaman Seafood Co. v. United States,
__ CIT __, 675 F. Supp. 2d 1363, 1370-72 (2010) (discussing the
(footnote continued)

settlement proceedings at the WTO.  This file (the "Red Garden
Margin File") lists every CONNUM-specific margin[43] calculated for
Shantou Red Garden Foodstuff Company ("Red Garden"), who was a
mandatory respondent in the LTFV investigation and sold the
highest volume of sales during the period of investigation
("POI").[44]  But while the Red Garden Margin File was created
using the data submitted by Red Garden in the LTFV
investigation, the CONNUM-specific margin calculations reflect
the adjustments necessitated by judicial review.[45]

         Analyzing these CONNUM-specific margins for the

---

mechanism and legal effect of Section 129 proceedings).

[43] In antidumping proceedings, different control numbers
("CONNUMs") are used "to identify the individual models of
products for matching purposes." AR5 2d Remand Results at 5
n.18.  "Identical products are assigned the same CONNUM in both
the comparison market sales database (or in a non-market economy
context, the factors of production database) and U.S. sales
database." Id. (citing Ch. 4 of the Antidumping Manual
(Oct. 13, 2009) at 10).  "CONNUM-specific margins result in
calculated margins that represent the pricing behavior related
to groups of sales," grouped by model type. Id. at 13.

[44] Although Commerce had previously stated that a different
respondent had sold the highest volume of subject merchandise
during the POI, Commerce has revisited the evidence and
determined that in fact Red Garden had the highest volume of
sales during the POI. AR5 2d Remand Results at 6 n.22.  No party
challenges this determination.

[45] See AR5 2d Remand Results at 8; AR4 Remand Results at 35;
Ad Hoc II, __ CIT __, 925 F. Supp. 2d at 1326 (discussing the
legal actions that ultimately resulted in revisions to the
dumping margins initially calculated by Commerce in the LTFV
investigation).

largest exporter of subject merchandise during the POI,[46]

Commerce found that, "despite the reduction of calculated

weighted-average margins subsequent to litigation, a significant

quantity and value of CONNUM-specific margins higher than

[112.81 percent] remain for at least one respondent [i.e., Red

Garden]." AR5 2d Remand Results at 13; AR4 Remand Results at 40.

Specifically, Commerce found that "more than half of the CONNUMs

examined in Red Garden's margin calculation had positive margins

[and,] [o]f those CONNUMs with positive margins, . . . the

percentage with dumping margins exceeding 112.81 percent[[47]] is

sufficient to demonstrate the probative value of the lowest

Petition margin of 112.81 percent." AR5 2d Remand Results

at 6-7; AR4 Remand Results at 34.  In addition, Commerce found

that, by quantity, "CONNUMs accounting for a significant volume

of merchandise under consideration were sold at prices that

---

[46] In addition to being the largest exporter of subject
merchandise by volume during the POI, Commerce found that "Red
Garden's margins are relevant for purposes of corroboration of a
margin based on information from the Petition" because "Red
Garden produced merchandise under consideration using all
[factors of production ("FOPs")] described in the Petition and
under the same production standards as the Petition." AR5 2d
Remand Results at 6; see also AR4 Remand Results at 33-34
(same).

[47] [[    ]] percent. See Attach. 1 to AR4 Remand Results
(Business Proprietary Mem. for Red Garden, A-570-893, ARP 08-09
(Sept. 26, 2013), ("Red Garden BPI Mem.")), Ct. No. 10-00275,
ECF No. 78-1, at 2; Attach. I to AR5 2d Remand Results,
Ct. No. 11-00335, ECF No. 107-1 (same).

resulted in margins which exceeded 112.81 percent." <u>AR5 2d</u>

<u>Remand Results</u> at 7; <u>AR4 Remand Results</u> at 34.[48]

        Based on these findings, Commerce concluded that "the

Petition rate continues to be relevant to this investigation,

even after taking into account subsequent changes to the

original calculations pursuant to remand redetermination, and

the rate to be corroborated [in] this [proceeding]." <u>Id.</u>

Accordingly, finding "no other information that would call into

question the reliability of that [Petition-based] rate," <u>AR5 2d</u>

<u>Remand Results</u> at 14; <u>AR4 Remand Results</u> at 41,[49] Commerce

concluded that "the commercial reality" – i.e., that a

significant quantity and value of CONNUMs were sold by a

---

[48] Specifically, Commerce found that CONNUMs accounting for
[[          ]]kg of subject merchandise were sold at prices that
resulted in margins exceeding 112.81 percent. <u>Red Garden BPI</u>
<u>Mem.</u> at 2.  In concluding that this amount accounted for a
significant volume of merchandise under consideration, Commerce
noted that a total sales volume reflecting this amount "would
have ranked Red Garden ahead of [[  ]] other companies at the
respondent selection phase of this investigation." <u>Id.</u>;
<u>see also</u> <u>LTFV Final Results</u>, 69 Fed. Reg. at 70,998 (referring
to a total of 58 respondents in the LTFV investigation – four
mandatory respondents, 53 respondents who requested a separate
rate, and the composite PRC-wide entity).

[49] Commerce also noted that Hilltop, who objects to the agency's
corroboration analysis in the <u>AR5 2d Remand Results</u> and the <u>AR4</u>
<u>Remand Results</u> (as discussed below) has offered no new credible
information that would rebut the presumption that a reliable
rate from a prior segment retains its reliability in subsequent
segments, absent rebutting evidence. <u>Id.</u>; <u>cf.</u> <u>KYD</u>, 607 F.3d
at 767 (discussing this presumption).

cooperating separate rate respondent at prices that resulted in antidumping margins exceeding 112.81 percent – confirmed "the continued reliability of the 112.81 percent rate and relevance to the PRC-wide entity as a whole." Id.[50]  On the basis of this analysis, Commerce concluded that the 112.81 percent PRC-wide rate "has probative value." AR5 2d Remand Results at 7; AR4 Remand Results at 34; cf. SAA at 870 (linking "corroboration" to an evaluation of "probative value").

   C. Discussion

          Hilltop challenges Commerce's corroboration of the 112.81 percent PRC-wide rate assigned to it in the fourth and fifth reviews.[51]  Specifically, Hilltop challenges the

---

[50] See Ad Hoc II, __ CIT __, 925 F. Supp. 2d at 1325 ("Commerce correctly posits that the PRC-wide rate need not be corroborated with respect to each particular respondent who, like Hilltop, is found to form a part of the PRC-wide entity and thus to be subject to the PRC-wide rate.") (citing Peer Bearing Co. – Changshan v. United States, 32 CIT 1307, 1313, 587 F. Supp. 2d 1319, 1327 (2008) ("[T]here is no requirement that the PRC-wide entity rate . . . relate specifically to the individual company. . . . [This] rate must be corroborated according to its reliability and relevance to the countrywide entity as a whole.") (citation omitted); Shandong Mach. Imp. & Exp. Co. v. United States, 33 CIT 810, 816 (2009) (not reported in the Federal Supplement) (explaining that Commerce has no obligation to corroborate the PRC-wide rate as to an individual party where that party has failed to qualify for a separate rate)).

[51] Hilltop's AR4 Br. at 47-55; Hilltop's AR5 Br. at 3-12.  The like domestic industry's party to this proceeding – the Ad Hoc Shrimp Trade Action Committee – does not object to the agency's corroboration analysis. See, e.g., [AHSTAC]'s Reply to Comments on Final Results of Determination Pursuant to Court Remand, Ct.

                                        (footnote continued)

methodology Commerce employed to corroborate the country-wide rate, arguing that 1) Commerce's reliance on sales data from a single respondent, without comparing such data to the documented pricing behavior of other respondents, was unreasonable[52]; 2) Commerce's reliance on a single respondent's subset of CONNUM-specific margins (those at or exceeding 112.81 percent) unreasonably cherry picks only those transactions that support an affirmative corroboration, while ignoring the remaining transactions that do not[53]; and 3) Commerce's reliance on data from the LTFV investigation to corroborate the countrywide rate applied in the fourth and fifth administrative reviews unreasonably presumes that pricing data from the LTFV investigation remain probative with respect to the later review

---

No. 11-00335, ECF No. 118, at 4-19 (arguing in support of Commerce's corroboration analysis).

[52] See Hilltop's AR4 Br. at 49 (emphasizing the documented pricing behavior of cooperative separate rate respondents throughout the history of this antidumping duty order); Hilltop's AR5 Br. at 6 (same); see also Hilltop's AR4 Br. at 51 (arguing that Commerce should have compared Red Garden's data to "additional margin data from other respondents"); Hilltop's AR5 Br. at 8 (same).

[53] See Hilltop's AR4 Br. at 49-50 (arguing that the quantity, value, and volume of POI sales made at or exceeding a 112.81 percent dumping margin were not sufficiently significant to support an inference of commercial reality for the countrywide entity); Hilltop's AR5 Br. at 6-7 (same). Cf. *supra* note 48 (discussing the volume of subject merchandise sold by Red Garden at or exceeding a 112.81 percent dumping margin).

periods.[54]

> ### 1. Commerce's Decision to Rely Solely on Red Garden's Data

As explained above, Commerce examined all CONNUM-specific margins calculated for the largest exporter of subject merchandise by volume during the POI.  These CONNUM-specific margin calculations do not suffer from the defects previously identified by the court with regard to the comparison data initially used by the agency to corroborate the countrywide rate in the LTFV investigation and in every segment of this antidumping proceeding thereafter.[55]  Hilltop argues that Commerce unreasonably looked solely at Red Garden's data, without comparing such data to the pricing behavior of other respondents.[56]  In response, Commerce argues that the analysis it employed to corroborate the probative value of the lowest Petition-based rate for the PRC-wide entity "was the same well-established methodology employed in the original investigation and many other proceedings." AR5 2d Remand Results at 13; AR4 Remand Results at 40.[57]

---

[54] See Hilltop's AR4 Br. at 48; Hilltop's AR5 Br. at 5.

[55] See Ad Hoc II, __ CIT __, 925 F. Supp. 2d at 1326.

[56] See Hilltop's AR4 Br. at 51; Hilltop's AR5 Br. at 8.

[57] See also AR5 2d Remand Results at 4-5 (describing the identical methodology initially used to corroborate the countrywide Petition-based rate in the LTFV investigation,

(footnote continued)

To "corroborate" "secondary information" (including, as here, information derived from the Petition), Commerce must satisfy itself that the information has "probative value." See SAA at 870.  The corroboration requirement ensures that antidumping duty rates calculated for non-cooperative respondents present "a reasonably accurate estimate of the respondent's actual [dumping] rate, albeit with some built-in increase intended as a deterrent to non-compliance."[58]  In particular, while "the statute explicitly allows for use of the 'the petition' to determine relevant facts when a respondent does not cooperate," De Cecco, 216 F.3d at 1032 (quoting 19 U.S.C. § 1677e(b)), "Commerce may not use the petition rate to establish the dumping margin when its own investigation reveal[s] that the petition rate was not credible." Gallant, 602 F.3d at 1323 (relying on De Cecco, 216 F.3d at 1033).

In reviewing the results of LTFV investigations involving merchandise from market economies, for example, the courts have rejected Commerce's use of the petition rate for

---

although the agency initially used data from a different respondent, who at the time had been (erroneously) deemed to be the largest exporter by volume, see id. at 6 n.22); AR4 Remand Results at 31-32 (same).

[58] Gallant Ocean (Thailand) Co. v. United States, 602 F.3d 1319, 1323 (Fed. Cir. 2010) (quoting F.lli De Cecco Di Filippo Fara S. Martino, S.p.A. v. United States, 216 F.3d 1027, 1032 (Fed. Cir. 2000)).

non-cooperating respondents when the dumping margins actually
calculated for similarly-situated cooperating respondents are
much lower than the margins alleged in the petition.[59]  But where
(as here) the non-cooperating respondent is a NME countrywide
entity – definitionally presumed to set prices without regard to
market conditions[60] – the actual pricing behavior of the
cooperative respondents that have demonstrated eligibility for a
separate rate (precisely because they have differentiated
themselves from the countrywide entity) does not bear upon the
credibility of dumping allegations against the NME countrywide
entity in the way that the pricing behavior of cooperative
market economy respondents reflects on the credibility of
dumping allegations against their similarly-situated market

---

[59] See Gallant, 602 F.3d at 1323-24 ("Commerce calculated the
[57.64 percent non-cooperative respondent's] rate based on the
highest dumping margin alleged in the petition.  The fact that
Commerce ultimately imposed dumping margins between 5.91 percent
and 6.82 percent for the same products after its initial
investigation shows the possession of better information and
shows that the adjusted petition rate was aberrational.");
De Cecco, 216 F.3d at 1032-34 (affirming the Court of
International Trade's holding that Commerce may not rely on a
46.67 percent petition-based rate for a non-cooperating
respondent because Commerce's investigation had ultimately
resulted in dumping margins ranging from 0.67 percent to 2.80
percent for similarly situated respondents).

[60] See 19 U.S.C. § 1677(18)(A) ("The term 'nonmarket economy
country' means any foreign country that [Commerce] determines
does not operate on market principles of cost or pricing
structures . . . .").

participants.  Simply put, the NME countrywide entity is, by
definition, not similarly-situated to the cooperative separate
rate respondents.[61]  For while the pricing behavior of the
cooperative respondents may be relevant to the commercial
reality of non-cooperating exporters from a *market* economy –
constrained as such exporters are by the market forces of
competition – no analog exists in the NME context, where the
countrywide government entity is presumed to act unimpeded by
such forces.  In the NME context, therefore, the inference that
the countrywide entity as a whole may be dumping at margins
significantly above the cooperating separate rate market
participants is not unreasonable.[62]

     Another critical aspect of the evidentiary record
presented here is that the countrywide rate at issue was not
only the rate applied to the PRC-wide entity in the initial LTFV
investigation, but has also been the rate applied to that entity
in at least five subsequent administrative reviews. Cf. KYD,

---

[61] See, e.g., AR5 Prelim. Results, 76 Fed. Reg. at 8342 ("We
consider the influence that the government has been found to
have over the economy to warrant determining a rate for the
entity that is distinct from the rates found for companies that
have provided sufficient evidence to establish that they operate
freely with respect to their export activities.").

[62] Cf. Hilltop's AR4 Br. at 48-50 (comparing the countrywide rate
to rates calculated for cooperative separate rate respondents
throughout the history of this antidumping duty order);
Hilltop's AR5 Br. at 5-7 (same).

607 F.3d at 767 (distinguishing Gallant and, by analogy,
De Cecco, because "the presumption that a prior dumping margin
imposed against an exporter in an earlier administrative review
continues to be valid if the exporter fails to cooperate in a
subsequent review" was not at play in those cases).  As the
Court of Appeals for the Federal Circuit explained, "it [is]
reasonable for Commerce to conclude, given [a respondent's]
refusal to cooperate in the [subsequent] administrative review
[or, as here, in the next *five* such reviews], that [such
respondent] had not altered its past pricing practices and that
its previous rate is reflective of its current pricing
practices." Id. at 764 (internal quotation marks omitted).

        Here, as in KYD, the PRC-wide entity's failure to
cooperate in these reviews "deprived Commerce of the most direct
evidence of [the PRC-wide entity's] actual dumping margin."
See KYD, 607 F.3d at 767.  But also as in KYD, "Commerce was
able to fill that evidentiary gap by looking to high-volume
[CONNUM]-specific margins for [a] cooperative compan[y] that
were higher than and close to the [112.81] rate, from which
Commerce concluded that that [this] margin does not lie outside
the realm of actual selling practices." Id. (internal quotation
marks omitted).[63]  Commerce reasoned that if a significant

---

[63] See *supra* note 48 (discussing the volume of subject
                                        (footnote continued)

percentage of the largest cooperating respondent's sales, by both quantity and volume, were sold at or above the 112.81 percent dumping rate, then it is reasonable to conclude "that a non-responsive, or uncooperative, respondent could have made all of its sales at the same rate." AR5 2d Remand Results at 14; AR4 Remand Results at 41.  This is a reasonable approach that, by its terms, does not require any analysis of data beyond that of the largest cooperative respondent.  Hilltop has not submitted any data or analysis that refutes the inferences Commerce draws from this data.  Accordingly, Commerce did not act unreasonably when it determined to limit the data used in its corroboration analysis to that contained in the Red Garden Margin File.[64]

> 2. Commerce's Determination that the Evidence Sufficiently Corroborates the Countrywide Rate from the LTFV Investigation

Next, Hilltop challenges Commerce's corroboration methodology in so far as it relies on CONNUM-specific margins, arguing that doing so permits the agency to cherry pick the

---

merchandise sold by Red Garden at or exceeding a 112.81 percent dumping margin).

[64] Cf. KYD, 607 F.3d at 764-68 (affirming corroboration of 122.88 percent Petition-based rate, despite the low margins (ranging from 0.80 percent to 1.87 percent) calculated for other respondents, because that rate was supported by 1) evidence submitted with the petition; 2) high-volume transaction-specific margins for cooperative companies at or above that rate; and 3) "the presumption that an exporter's prior margin continues to be valid if the exporter fails to cooperate in a subsequent proceeding").

transactions that support affirmative corroboration, while ignoring those that do not.  But as Commerce explains, "CONNUM-specific [i.e., model-specific] margins result in calculated margins that represent the pricing behavior related to groups of sales, rather than individual sales, and, consequently, do not result from cherry picking of individual transactions." <u>AR5 2d Remand Results</u> at 13; <u>AR4 Remand Results</u> at 40.[65]  Moreover, the percentage of Red Garden's sales made at prices resulting in dumping margins at or exceeding 112.81 percent covered a volume of subject merchandise sufficiently significant to support a reasonable inference that this rate is probative of the non-cooperating countrywide entity's actual pricing behavior.[66]

        3. Commerce's Determination that the LTFV
           Investigation's Countrywide Rate Remains Probative
           for the Fourth and Fifth Reviews

Finally, Hilltop argues that Commerce's corroboration analysis is flawed because it relies on data from the LTFV investigation to corroborate a rate applied in later review periods.  But Hilltop ignores judicial precedent holding that the continued reliability and relevance of data from prior segments of an antidumping proceeding is presumed absent

---

[65] <u>See also</u> *supra* note 43 (explaining CONNUM-specific margins).

[66] <u>See</u> *supra* note 48 (discussing the volume of subject merchandise sold by Red Garden at or exceeding a 112.81 percent dumping margin).

rebutting evidence. KYD, 607 F.3d at 764-68 (discussing cases).

The rate applied to the PRC-wide entity throughout the history of this antidumping duty order was calculated in the underlying LTFV investigation.[67]  It was the lowest of a range of rates calculated using information derived from the Petition.[68] To satisfy itself that this rate had probative value regarding the non-cooperating PRC-entity's actual pricing behavior, Commerce evaluated the supporting evidence and also compared this rate to the model-specific dumping margins calculated for a cooperating respondent who produced its merchandise using all of the same factors of production and under the same production standards as the Petition.[69]  Based on this analysis, Commerce concluded that, because a significant percentage of the quantity and value of this cooperating respondent's sales represented prices at or above the lowest Petition dumping margin of 112.81

---

[67] See Certain Frozen and Canned Warmwater Shrimp from the People's Republic of China, 69 Fed. Reg. 70,997, 71,003 (Dep't Commerce Dec. 8, 2004) (notice of final determination of sales at less than fair value) ("LTFV Final Results") (assigning 112.81 percent as the PRC-wide rate).

[68] Certain Frozen and Canned Warmwater Shrimp from the People's Republic of China, 69 Fed. Reg. 42,654, 42,662 (Dep't Commerce July 16, 2004) (notice of preliminary determination of sales at less than fair value) (unchanged in the final determination, 69 Fed. Reg. at 71,003).

[69] See, e.g., AR4 Remand Results at 31-32 (describing the initial corroboration of the PRC-wide rate during the LTFV investigation).

percent, that margin had probative value regarding the likely
pricing behavior of the non-cooperating PRC-wide entity as a
whole.  Now, having revisited its calculations to implement the
outcome of judicial review, Commerce continues to draw the same
reasonable conclusions from the (revised) evidence.[70]

        Hilltop has presented no new evidence to suggest that
the Petition-based countrywide rate, as corroborated using
(appropriately recalculated) contemporaneous data from the
largest cooperating respondent during the POI, has lost its
probative value. See AR5 Remand Results at 14 (citing KYD, 607
F.3d at 767); AR4 Remand Results at 41 (same); see also SAA
at 870 (linking "corroboration" to "probative value").  While
Commerce has assigned this rate to the PRC-wide entity
throughout the entire history of this antidumping duty order –
including in three prior reviews before the two reviews now at
issue – neither the PRC-wide entity nor any other respondent has
come forward with any more accurate information.  Accordingly,
in addition to corroborating the probative value of this rate by
examining the evidence submitted along with the Petition from
which it is derived and the pricing behavior of the largest
cooperating exporter during the POI, Commerce reasonably
inferred that the PRC-wide margin assigned in the prior segments

---

[70] See *supra* notes 46-48.

of this antidumping proceeding "is the most probative evidence

of current margins because, if it were not so, the importer,

knowing of the rule, would have produced *current* information

showing the margin to be less." <u>KYD</u>, 607 F.3d at 766 (emphasis

in original) (internal quotation marks and citation omitted).[71]

## CONCLUSION

For all of the foregoing reasons, Commerce's <u>AR5 2d

Remand Results</u> and the <u>AR4 Remand Results</u> are each sustained.

Judgments will issue accordingly.

                                    ___/s/ Donald C. Pogue____
                                    Donald C. Pogue, Chief Judge

Dated: May 20, 2014
       New York, NY

---

[71] <u>See also</u> *supra* note 64 (noting the similarity of this case to
the facts in <u>KYD</u>).